**Rose A. Clark, Appellee, v. Public Service Company of Northern Illinois, Appellant.**

**Gen. No. 8,733.**

Opinion filed September 18, 1934. Rehearing denied February 5, 1935.

GARDNER, FOOTE, MORROW & MERRICK, of Chicago, for appellant; WALTER M. FOWLER, of Chicago, of counsel.

C. W. REED and RUSSELL W. KEENEY, both of Naperville, and GALE C. MARQUESS, of Glen Ellyn, for appellee; RUSSELL W. KEENEY, GALE C. MARQUESS and GORDON MOFFETT, of Lombard, of counsel.

MR. JUSTICE DOVE delivered the opinion of the court.

This suit was originally instituted by George W. Clark and Rose A. Clark against the Public Service Company of Northern Illinois to recover damages which they alleged they sustained as a result of their property being injured and destroyed by a fire on July 30, 1931. Before the trial, George W. Clark was dismissed out of the suit as a plaintiff and the declaration appropriately amended. As amended the declaration consisted of five counts. In the first count it was alleged that on July 30, 1931, the defendant was a public utility engaged in the business of furnishing to the inhabitants of DuPage county and other communities, electric light and power and for that purpose controlled certain lines of wires and meters; that the plaintiff owned certain real estate outside the corporate limits of any city or village, but in the vicinity of Wheaton; that said premises were improved by a modern dwelling, trees, plants and shrubbery of great value; that a certain well of water was also upon said premises, the water being pumped therefrom by means of a pump operated by electricity supplied through its wires and meters by the defendant for a reward; that the meter was located in the building of the plaintiff; that plaintiff relied solely upon its pump and water supply to protect her premises from loss by fire, all of which defendant knew or by the exercise of reasonable care could have known; that the premises caught fire on the date aforesaid without the fault of the plaintiff; that the water, pump and electric current were then being used or could have been used for the purpose of extinguishing said fire; that it therefore became the duty of defendant to keep said meters and wires in good condition so as to supply electric power for the pump and not to cause the same to be removed or disconnected so as to cause the pump to become inoperative; that after the premises had become ig-

nited, but at a time when the fire could have been extinguished without loss to the plaintiff by the use of water furnished by the pump, the defendant negligently, carelessly and improperly removed and disconnected the meters from the premises, thereby stopping the flow of electricity and cutting off the supply of water and causing the building, trees, plants, and shrubbery on the premises to be burned and destroyed. In the second and fifth counts the specific negligence alleged was that defendant negligently, carelessly and improperly disconnected and severed the electric wires. The third count charge wilfulness and wantonness. The fourth count charged that the duty of the defendant was to use the highest degree of care consistent with the practical operation of its business and to keep its wires and meters in good condition and charged the same negligence as alleged in the first count. To this declaration a plea of the general issue was filed and a trial had. At the conclusion of the evidence offered on behalf of the plaintiff, an instructed verdict in favor of the defendant was returned as to the third count, which charged wilfulness and wantonness. As to the other counts of the declaration, defendant's motions for an instructed verdict were denied and the trial proceeded, resulting in a verdict in favor of the plaintiff for $8,600, upon which the court, after overruling a motion for a new trial, rendered judgment and the record is before us for review by appeal.

It is insisted by appellant first, that the evidence failed to disclose that it was guilty of any negligence or wrongful act or that it violated any duty it owed appellee, and that therefore the trial court should have directed a verdict in its favor; second, that appellee failed to establish by the evidence, with reasonable certainty, the amount of her loss and therefore only nominal damages could be recovered; third, that

it was error to overrule appellant's motion for a new trial inasmuch as the verdict is manifestly against the weight of the evidence, that erroneous instructions, particularly as to the measure of damages, were given, that incompetent evidence was admitted over its objection and prejudicial remarks were made by counsel for appellee in the presence of the jury.

Inasmuch as the judgment must be reversed and the cause remanded for another trial, we deem it inadvisable to express an opinion as to the weight of the evidence. There was evidence tending to prove that appellee was the owner of the premises in question, being two acres of land located a mile and a half from the city limits of Wheaton. The property was improved by a modern 11-room, two-story, frame dwelling house and the grounds were planted with trees, shrubbery and landscaped. On July 30, 1931, the property was occupied by George W. Clark and family, which consisted of his wife and two daughters. George W. Clark is the son of appellee, who at this time was living in Chicago. Appellant furnished the occupants of the dwelling with the necessary electric current, not only to light the house, but to drive an electric one-horse-power motor. A Cataract fresh water air pressure system furnished the occupants of the house with necessary water supplied from a well 136 feet deep, located about 50 feet from the house, the normal water level in the well being 66 feet from the surface of the ground, and a pipe went down in the well about 70 feet. The system was automatic and consisted in part of this electric motor, an air compressor and storage tank, all located in the basement of the dwelling. The motor compressed the air into the tank. The pump was operated by air pressure carried from the storage tank by an air line leading from the air storage tank to the top of the pump. On the air line leading from the air storage tank were two gauges,

the one nearest the air storage tank showing the pressure on the tank and the other gauge showing the well pressure on the pump. In the well house and between these two gauges was a reducing valve, which was a check on the whole system. These gauges operated automatically and when the gauge showed 40 lbs. pressure in the tank, the motor would start automatically and supply more air into the tank. There was an outside faucet or sill cock on the east foundation wall suitable to attach a garden hose and there was an inch and a quarter pipe leading out of the foundation, with a cap on it suitable to attach a hose of that dimension, and there was a garden hose in the pump house and an inch and a quarter web or fabric hose hanging up on a reel in the well house on the day of the fire.

About four o'clock in the afternoon of July 30, 1931, George W. Clark left the home to go to Wheaton, and no one was there when he left. Shortly thereafter a fire from some unknown origin broke out in the southeast upper corner of the dwelling. The Wheaton fire alarm sounded and George W. Clark arrived at his home not long thereafter.

Upon their way home from work, two of appellant's employees discovered the fire and immediately upon their arrival began to help remove the furniture from the house. Later they went across the road and cut the service wires at the pole and then went inside the basement and removed the meter. Neither of these employees had any knowledge of the existence of the water system in the dwelling and the reason they cut the wires was to keep from injuring the firemen and others who were about the premises and to protect appellant's equipment from the danger of a short circuit, which would destroy the equipment and service to other customers of appellant.

The Wheaton Fire Department arrived at the fire before George W. Clark came home. The fire had

gained considerable headway. The chemical truck, consisting of four 40-gallon tanks, was used, and when these tanks were exhausted, water was brought from the house and cistern, but it was impossible to check the flames and the house was destroyed. Upon his return home, which occurred while water was being carried from the cistern to the chemical truck, George Clark went to the rear of the house, then to the well house, found that there was no pressure indicated, observed that some of the furniture had been removed from the house, then went to the basement and found that the meter had been removed and on going outside observed that the electric wires across the street had been cut. When he arrived, the south wall of the building was in flames, but according to his testimony there was no smoke in the basement and prior to the time he left that day the water system was working and in good order.

It further appeared that the plaintiff owned the premises when the meter was installed and connected with appellant's wires, but she subsequently deeded the property to her son, who installed the water system and electric motor and later her son conveyed the property to her in 1928.

In support of its first contention, appellant insists that George W. Clark occupied the premises and its service was rendered to him for residential light; that its bills so disclosed and as it had no contractual or other relation with appellee, it owed no duty to appellee, and appellee therefore had no legal right to require appellant to furnish electric power to run the electric motor while the fire was in progress.

In support of this contention, appellant relies upon the cases of *Peck v. Sterling Water Co.*, 118 Ill. App. 533; *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U. S. 220, and other cases of like character. The *Peck* case was an action brought by a citizen of

Sterling to recover damages from the water company for alleged negligence in failing to perform certain duties imposed upon it, under the provisions of a contract entered into by the City of Sterling and the Sterling Water Company. In this contract the water company agreed to install hydrants and maintain a certain water pressure in consideration of a certain hydrant rental per year. It was held in that case that an individual citizen could not maintain an action against the water company for a breach of such a contract. The reasons the court assigned were that the contract was entered into between the city and the water company and that there was no privity between the citizen suing and the defendant, and as a citizen cannot hold a city liable for loss by reason of its failure to furnish adequate water supply, neither can a citizen hold the agent liable with whom the city has contracted to perform this governmental function.

In *German Alliance Ins. Co. v. Home Water Supply Co., supra,* which counsel for appellant states is directly in point, it appeared that the water company had agreed to supply a city and its inhabitants with water suitable for fire, sanitary and domestic purposes, and the breach of duty of which the plaintiff complained was that the defendant did not lay water pipes pursuant to the provisions of an ordinance and as a result thereof there was no hydrant near plaintiff's property and plaintiff's property was destroyed because he was deprived of water. It further appeared that the city had agreed to pay an annual rental of $40 for each hydrant and to levy a tax sufficient to pay the same. In holding the plaintiff could not recover, the court stated that the suit was for a breach of contract, that a third person could not sue for a breach thereof, inasmuch as he was a stranger thereto unless he is in privity with the parties and given a direct interest therein.

What these cases hold is that there is no privity of contract between a citizen of a city and a water company which was furnishing a city and the inhabitants thereof water by virtue of the provisions of an ordinance or franchise adopted by the city and under which a water company was operating. In the instant case it is true that the contract to furnish electric current was made with the occupant of the premises and not appellee, but appellee is not basing her action upon any breach of contract, but for an alleged tort. The charge of negligence which appellee makes is that appellant carelessly, negligently and improperly cut its electric wires with a resultant damage to appellee. We think the foregoing cases are distinguishable from the instant case and we are inclined to agree with the opinion in the case of *Mullen v. Otter Tail Power Co.,* 130 Minn. 386, 153 N. W. 746, and hold that appellant, even though there was no contractual relation between it and appellee, owed appellee the duty not to cut off the supply of electric current going to her premises arbitrarily. The *Mullen* case, *supra,* was an action to recover from a public utility the value of a stock of merchandise and fixtures destroyed by fire, the alleged liability of the defendant being that the defendant, at the time of the fire, negligently cut the service wires that supplied electric light to plaintiff's store and the plaintiff, by reason of the darkness which ensued, was unable to remove and save his stock or fixtures. It appeared in that case that the defendant owned and operated an electric light plant in the City of Morris, Minnesota, furnishing electric light current to the plaintiff and other consumers under a contract with them. The plaintiff occupied a portion of a building which he used as a clothing and furnishing store, another portion of which was used as a restaurant. On the morning of February 20, 1930, the premises were destroyed by fire and the greater por-

tion of the plaintiff's stock of goods and fixtures was consumed. It appeared from the evidence that the fire started in the restaurant and that soon after the fire alarm sounded, an electrician in the employ of the defendant cut the electric wires which supplied plaintiff's store with current some 40 minutes before there was any necessity of so doing and with knowledge that by so doing he might prevent the plaintiff from saving his property; it further appeared from the evidence that had the electric light been burning in the store, all of the stock of goods and fixtures could have been removed to a place of safety in 20 minutes. In its opinion the Supreme Court of Minnesota said: "The contract between the parties is not important except for the bearing it has on the question of what the legal duty of defendant was. It is not a breach of contract that plaintiff complains of, but a tort, actionable negligence on the part of a servant of defendant in the course of the performance of his duties. We are unable to find that the state of facts has ever been presented to any court for its decision as to whether it constitutes actionable negligence. It is admitted that ordinances have been enacted in some cities requiring power companies to cut their electric wires in case of a fire, but there was no such ordinance in the city of Morris. We hold, however, that in case of fire, a power company supplying electricity to consumers has the right to cut its wires in case it is reasonably necessary to do so in order to save loss or damage to its property. But this does not answer the present question. While the company should not be compelled to take nice chances as to the particular moment of time when it is justified in severing the wires supplying current to a burning building, there would certainly be no excuse for such action in a case where it was apparent that there was no danger for hours of the fire reaching a point where the wires

would be affected, and where it was apparent that the act might cause loss to the consumer. It cannot be said that defendant owed no legal duty to plaintiff. It could not cut off his supply of current arbitrarily and escape liability for consequent damages. We think it must be held that the legal duty of defendant was not to deprive plaintiff of needed light unless and until the protection of its own interests, or safety to the public, made it reasonably necessary to do so. It would be liable for a breach of this duty that was the proximate cause of damages to plaintiff. And we are unable to hold on the evidence before us that the trial court was not justified in finding that there was this breach of duty, as before pointed out. Finneman cut the wires from 40 to 50 minutes before there was any necessity for doing so, either from the standpoint of protecting the property of defendant or that of protecting people on the street from electrical shocks. That it was an error of judgment defendant concedes. To the knowledge of Finneman, the fire was then confined to the restaurant, there was no wind, and it was not making rapid progress toward the store. He knew that plaintiff had a stock of goods that could be saved if he had light. His act was unnecessary, and the trial court's finding that it was a negligent act must be sustained. Was the negligence of defendant in cutting the wires the proximate cause of plaintiff's loss? We are unable to draw a sound distinction between this case and that of *Erickson v. Great Northern Ry. Co.,* 117 Minn. 348, 135 N. W. 1129, 39 L. R. A. (N. S.) 237, Ann. Cas. 1913 D 763, where it was held that the act of cutting a hose being used to extinguish the fire was the proximate cause of the burning of the hotel, the evidence being sufficient to sustain a finding that the fire would have been extinguished but for the act. In the present case the evidence is uncontradicted that plaintiff's stock and fixtures could and would have

been saved had defendant postponed for half an hour the severing of the service wires. It is impossible to distinguish between the two cases. We hold that the evidence sustains the finding of the trial court that the negligent act of cutting the wires was the proximate cause of plaintiff's loss, unless it can be said that plaintiff could have averted the loss by the exercise of reasonable diligence after discovering that the wires had been severed.''

In the instant case we are inclined to follow this authority in the absence of any controlling authority in our own State, and hold that while appellant had a perfect right to cut its service wires whenever it was reasonably necessary for it to do so in order to protect its own interests or provide safety to the public, it had no right to do so arbitrarily and if it did so, it can be held liable for consequent damages. Whether it acted arbitrarily is a question of fact. Appellant insists that the evidence discloses that its servants only cut the wires after they had been at the fire 20 or 30 minutes and then did so only in order to protect the firemen and others from the danger of coming in contact with its live wires as well as to protect its own property by virtue of a short circuit and to protect the property of its other customers from loss. Appellee insists that notwithstanding the direct testimony in the record to the effect that the servants of appellant cut the wires and removed the meter 20 or 30 minutes after their arrival, yet the facts and circumstances in evidence substantiate the contention of appellee that the wires were cut and the meter removed immediately upon the arrival of the servants of appellant.

Wesley Hout and Ira Singletary were the employees of appellant who were working on appellant's transmission line a mile and a half from appellee's premises on the day the fire took place. They both testified

that they quit work at 4:30 p. m., and started home in a truck, and while they were some distance away from appellee's premises their attention was directed to the fire and at that time they observed great volumes of black smoke coming therefrom. When they arrived at the Clark premises, the truck was driven into the yard. The fire truck from Wheaton had not arrived and they both assisted in removing the furniture, which included a piano, from the front room to the porch and from the porch over to a vacant lot. According to Hout's testimony, between 20 and 30 minutes elapsed after their arrival before the service wire was cut by Singletary at the pole on the opposite side of the Geneva road from the Clark premises. According to Singletary, he did not cut the wire until after he had been on the premises for 25 minutes.

In this connection appellee particularly calls our attention to the testimony of Alice Purnell. She testified on behalf of appellee to the effect that she was at her home located two or two and one-half miles distant from the Clark premises on the afternoon of the fire; that her aunt lived directly across the road from the Clark place and that her aunt notified her family by phone of the fire, and she accompanied her mother, who drove the car, and her father to her aunt's home, and after parking their car in her aunt's yard walked over to the northeast corner of the Clark place and there remained 100 or 150 feet from the house until it was completely destroyed. At the time she arrived, there were somewhere between 45 and 60 people already there and the fire truck from Wheaton had already arrived. Ten minutes after her arrival she observed Mr. Singletary arrive in his truck, and noticed him walk from the front to the rear of the house, observed him on a ladder on the house and on a pole at the north side of the lawn and while she saw others engaged in carrying out furniture, she did

not see Singletary assist. She observed Singletary back his truck out and at that time the fire had not progressed very far.

We have considered all the evidence, not only upon the question as to the time when appellant's employee cut the wire, but also upon the question as to whether the water system could have been used and a portion of the property saved, even though the wires had not been cut and also that offered in support of appellant's contention that its current was furnished for lighting purposes only and that none of its employees had any knowledge that appellee's water system had any connection with appellant's electric current or that it was in any sense essential thereto. The undisputed evidence is that the employees of appellant who cut the wires did not know of the water system and George Clark, appellee's son, testified that he never consulted with any of appellant's servants with reference thereto, but did speak to appellant's service man at one time at West Chicago with reference to the motor. It appears, however, from the evidence that this motor was in the basement near the air compressor and the pressure tank, at the time appellant's service lines were connected to appellee's premises and that appellee owned the premises at that time and appellant's meter was on the north wall of the basement. This is substantially all the evidence in this record to sustain the averment of the declaration that appellant knew or by the exercise of reasonable care and vigilance could have known of the use appellee was making of appellant's current; still, it is a well known fact that electrical current is used for many, many purposes other than lighting and its use in connection with appellee's water system is not unusual or extraordinary. Appellant undertook to furnish appellee's premises with electric current. The occupant of the premises was free to use that current for any

proper purpose and it was a proper purpose to use it to drive a motor. In all the cases involving the liability of a manufacturer to third persons, there exists no contract relation between the parties and liability is grounded upon the negligence of the manufacturer. For instance, in *McPherson v. Buick Motor Co.*, 217 N. Y. 382, 111 N. E. 1050, it appeared that the plaintiff was injured by reason of a defective wheel of the automobile in which he was driving. This automobile was purchased by the plaintiff from a retail dealer, but the plaintiff sued the manufacturer and based his recovery upon the ground that the manufacturer was guilty of negligence in failing to inspect the car properly and a recovery was allowed on the ground that the law requires a person to act with reasonable care if under all the circumstances his conduct is reasonably calculated to cause injury. It is therefore, in our opinion, not a question upon this record of whether any contractual relation existed between the parties hereto, but the inquiry is, Did appellee have any interest in those premises at that time which was under legal protection, and if so, did or did not appellant act reasonably with respect to appellee's premises in severing the service wires at the time they were severed? These are questions of fact for the jury, provided there is any evidence in the record from which the jury would be warranted in finding that the servants of appellant acted unreasonably or arbitrarily or carelessly or negligently or improperly. There must also be, as frequently expressed by the authorities, a reasonably clear, physical, causal connection between the negligence and the injury claimed as a result thereof, so that it can be seen that, but for the negligence, the injury would probably have not resulted, or as otherwise sometimes expressed, the wrongful act or negligence must have been an appreciable or substantial factor in producing the dam-

age. This, too, is a question of fact and while the evidence upon these several questions of fact may not be all that would be desired, still in our opinion the evidence warranted the court in submitting the case to the jury and the trial court did not err in denying appellant's motions for an instructed verdict.

Robert B. Faxon, a nurseryman and landscape architect, testified that he had examined the trees upon the Clark premises since the fire and found that nine trees were damaged and had no ornamental or other value; that he had an opinion as to the cause of the damage or injury, and in his opinion the damage was caused by fire through the branches, and that the fair, usual cost of replacing these trees, i. e., delivering them, replanting them and putting them in place would aggregate $3,639, itemized as follows, viz.: one hackberry $127; the 7½-inch American elm $115; the five-inch American elm $56; the 5½-inch horse chestnut $67; the 5-inch Norway maple $63; the Silver maple $711; the two Black Walnut trees $1,800, or $900 each; and the Poplar $700.

Jake Hahn, a member of the Wheaton Volunteer Fire Department for 17 years, was at his place of business one-half block from the fire house when he heard the alarm and immediately thereafter reported at the station and arrived at the fire between 10 and 15 minutes after the alarm sounded, saw the premises on fire before he had arrived, and when he got there found the southeast corner of the house ablaze, applied the chemical first from the ground, then went inside and up the stairs to the second floor where he found that one of the rooms was full of fire. Counsel for appellant conceded at the trial that this witness was a competent, experienced fireman, and in answer to a question whether in his opinion "at any time that you were at the fire was the fire under control?" answered: "That is a pretty deep question to answer.

I wouldn't want to answer no, nor I would not want to answer it yes for this reason. Sometimes a man misjudges a thing like that. It might have been under control by some party. He would think so and by another man he would not think so." The witness later was permitted to state that he had an opinion as to whether the fire was under control and that in his opinion it was. According to this witness it took between 30 and 40 minutes from the time he arrived until the roof of the dwelling fell in and in about one hour from the time he arrived, the dwelling was completely consumed.

Lee Farnsworth testified that he was in the real estate business and was experienced in the construction of buildings and dwellings, and over appellant's objection he was permitted to testify that a frame dwelling house well kept up would depreciate about two per cent a year; that for six years the depreciation would be a little better than six per cent and that the life of an ordinary frame dwelling was 50 years.

It is insisted by appellant that the trial court erroneously permitted all of this testimony to go to the jury. In our opinion the testimony of Faxon to the effect that the trees which he had examined on appellee's premises and which he found to have no ornamental or other value had been damaged by fire through their branches was competent. Furthermore, the jury were permitted by agreement of counsel to view the premises and if appellant's objection that the jury were as fully competent as this witness to pass upon this question, then no harm resulted from permitting this experienced and qualified nurseryman to express his opinion. He was shown to have the specialized knowledge essential before he was permitted to express his opinion, and we think the trial court ruled properly in admitting this testimony.

Whether the fire was or was not under control at any time after the service wires were cut was one of the ultimate decisive questions the jury were called to pass upon. If the fire was under control and the jury found with appellee upon her other contentions then there was nothing for the jury to do but assess appellee's damages. On the other hand if they found all of the other contentions in favor of appellee and yet believed that the fire was beyond control, no matter if the department and helpers would have had the benefit of appellee's water supply, still there could have been no recovery. The previous answer of Hahn discloses that his answer when made was little more than conjecture upon his part, and we are of the opinion that to permit this witness to express his opinion upon this question invaded the province of the jury. In the instant case appellee contended that she was damaged because of appellant's negligence. Appellant contends that she was not. Where there is a conflict as to whether the party suing was injured as a result of defendant's negligence it is not competent for a witness, even though testifying as an expert, to give his opinion on the fact which the jury is to determine. *Fellows-Kimbrough v. Chicago City Ry. Co.,* 272 Ill. 71.

During the trial appellant stipulated, not waiving however, but insisting upon its objections as to relevancy and materiality, that the cost of rebuilding the dwelling, fixtures and equipment would have been $15,000 on the day of the fire. While appellee was testifying she was asked how much she paid for the premises when she acquired them in 1923, and before the court could rule upon an objection, replied $13,000. The court afterward sustained the objection but as no motion was made to exclude the answer, appellant is in no position to complain.

Instruction No. 7, given at the request of appellee, is as follows, viz.:

"The court instructs the jury that if you find from the evidence that a portion of plaintiff's dwelling house and trees growing on her premises adjacent thereto were destroyed by fire, due to the wrongful act of the defendant in cutting the electric service wires serving plaintiff's premises, and the removal of the meter therefrom, the proper measure of damages (if you find from the evidence the plaintiff is entitled to damages) to be employed, is the fair and reasonable value of restoring that portion of the dwelling house on plaintiff's premises to the condition it was in on July 30, 1931, and prior to the fire, which would not have been destroyed had it not been for any act or acts of the defendant in cutting of the electrical service wires serving plaintiff's premises, and the removal of the meter therefrom, and the fair and reasonable value of such trees in place on said premises on July 30, 1931, which would not have been destroyed had it not been for the act or acts of the defendant in cutting of the electric service wires serving plaintiff's premises and the removal of the meter therefrom."

This instruction should not have been given. It told the jury that the act of appellant in cutting the service wires was wrongful. It states the measure of damages to be the restoration of appellee's dwelling and trees to the condition they were in on July 30, 1931, prior to the fire. We are of the opinion the proper measure of damages in the instant case is the difference in market value of the property before and after the fire. *Peck v. Chicago Rys. Co.*, 270 Ill. 34; *Swain v. Mehl*, 200 Ill. App. 496; *Jones v. Sanitary District*, 252 Ill. 591; *Champlin v. Baltimore & O. S. R. Co.*, 140 Ill. App. 94; *Shrigley v. Chicago & E. I. Ry. Co.*, 158 Ill. App. 473; 17 C. J. 880–891.

In 17 C. J. 880, it is said: "The measure of damages for injury to real property is not invariable. Ordinarily, the difference between the fair value of the property immediately before and immediately after the injury will be taken as the measure, particularly where the injury is permanent. . . . Where, however, the thing which is destroyed or injured, although a part of the realty, has a distinct value without reference to the realty on which it stands, or from which it grows, the recovery is for the value or depreciation of value of the thing destroyed or injured, and not for the difference in the value of the land before and after the destruction. Under some circumstances, the proper measure of damages may be the cost of restoring the property to its original condition, as where the injury is susceptible of remedy at a moderate expense and the cost of restoration may be shown with reasonable certainty." In support of this last statement, the author cites *Donk Bros. Coal & Coke Co. v. Novero*, 135 Ill. App. 633; *Donk Bros. Coal & Coke Co. v. Slata*, 133 Ill. App. 280; *Swanson v. Nelson*, 127 Ill. App. 144. We have examined these cases. The *Slata* case, *supra*, was an action to recover damages sustained by reason of defendant mining coal from underneath plaintiff's premises, thereby removing the surface support which caused the buildings on plaintiff's premises to settle, crack and twist. "As a general rule," said the court in its opinion, "the measure of damages in actions for injuries to real property is the difference in market value before and after the injury to the premises. To this rule there are exceptions, and especially where the injuries are of the kind and character alleged in this case, it has been held that the cost of repair or of restoring the premises to their original condition, is the true and better rule to apply." The *Novero* case, *supra*, is likewise a case to recover damages oc-

casioned by subsidence and the same measure of damages was applied as in the *Slata* case, *supra.* In the *Swanson* case, *supra,* the plaintiff sought to recover damages on account of defendant inserting the ends of four 2 x 10 joists into her brick wall, upon which rested a bay window and which the plaintiff claimed caused her wall to settle and her building depreciated in value. In holding that evidence of the cost of disconnecting the bay window and repairing the wall so that it would be in as good condition as it was before the injury complained of was admissible, the court said that the cost of restoration or repair is to be considered the measure of damages in cases of injuries to real property. This "makes the damages conform to the general theory of the law that they are to be indemnity or compensation. But it frequently happens that an injury or trespass to real property may be in a certain sense irreparable. The condition of things before the trespass was committed or the injury done cannot be restored at all, or can be restored only at a very great and disproportionate expense. In either of these cases another measure of damages is properly adopted by the courts, namely, the difference in market value of the property before and after the act complained of. The result of this reasonable view which has been taken by almost all courts of last resort where they have had occasion to pass on the matter has been to establish a rule that makes the measure of damages, in cases of injury to real estate, the cost of restoration or the difference in market value, as one or the other is the less amount."

The case of *FitzSimons & Connell Co. v. Braun & Fitts,* 199 Ill. 390, was an action brought against a public contractor who, in excavating for a tunnel, used dynamite, which resulted in injury to buildings of the plaintiff and the court there held that it was proper to advise the jury to adopt as the measure of damages

the cost of repairing the building so that it would be in as good condition as it was before it was damaged by the explosion. In its opinion the court said: "We think the cost of repairing the building and restoring it to its proper condition was the true measure of the damages. It was so held in *Hide v. Thornborough*, 61 Eng. C. L. 250, and in *Shreves v. Stokes*, 8 B. Mon. 453, in which cases the injuries were occasioned by excavations made on adjoining lots to those on which the buildings injured were situate."

Recovery in these cases is not based upon negligence, but upon a trespass and the courts adopted the view that the buildings destroyed had a value apart from the real estate upon which they stand.

In *Jones v. Sanitary District, supra*, it was held that the correct measure of damages for injuries or damage to real estate is the difference in value of the land before the injury and its value afterward. Where a meadow is destroyed or injured by fire, the correct measure of damages is the difference between the value of the premises before and after the fire. *Champlin v. Baltimore & O. S. R. Co., supra*. In 17 C. J. 891, it is said that the measure of damages for the destruction of ornamental and shade trees is the difference in the value of the land before and after the injury and the same rule applies to orchards. *Shrigley v. Chicago & E. I. Ry. Co., supra.*

In the instant case, the court having admitted evidence that it would cost $3,639 to replace the nine shade and ornamental trees which were injured by the fire, the jury under the instructions were warranted, having found appellant guilty of the negligence charged, in awarding this sum to appellee for the damage done by the destruction of the nine trees alone. The result of the fire to appellee's premises, improved as they were by a modern dwelling, shade and ornamental trees, was that nothing remained of the dwell-

ing except the foundation and nine of the nearby trees were killed, the damage was permanent and in our opinion there is no reason for applying any rule as to the admeasurement of damages except the general, universal rule applied in similar cases, which is the difference between the fair value of the two-acre tract immediately before and immediately after the fire. This being the proper measure of damages, it was error not to sustain appellant's objections to the testimony of Faxon as to the cost of replacing the nine trees about which he testified and also the testimony of Farnsworth as to the per cent of depreciation of a frame dwelling each year.

Under the authority of *Molloy v. Chicago Rapid Transit Co.,* 335 Ill. 164, appellee's instruction No. 2 should have been refused. Appellee's instruction No. 5 was an abstract proposition and should not have been given. Instruction No. 6 is not accurately drawn and is subject to the criticism directed against it in that it assumes that severing the wires rendered the water system inoperative. This was a controverted point and it is improper for an instruction to assume as a fact a controversial matter.

It is next insisted that the evidence did not show with reasonable certainty the amount of the loss appellee sustained and therefore the trial court erred in refusing appellant's request that an instructed verdict for nominal damages be returned. In support of this contention, appellant insists that, conceding it arbitrarily cut the wires at a time when, under the evidence, it was wrongful for it to do so, still, the fire had been in progress for some time and that the north and west and southeast sides, the roof and a portion of the inside of the dwelling were on fire and therefore the evidence is so indefinite and uncertain as to what part of the dwelling, trees and shrubbery could have been saved but for the alleged negligence of appellant

that the jury could not estimate with reasonable certainty the amount of appellee's damages. What we have already said disposes of this contention and if the case is again tried, it will be on a different theory as to the measure of damages. The theory upon which the case was tried was that the proper measure of damages was the cost of replacing the building and trees in the condition they were in before the fire, and this was sought to be established by showing the amount it would cost to rebuild the dwelling at the time of the fire, together with the estimated depreciation since it was practically rebuilt in 1928, together with proof as to the actual cost of replacing the several trees that were killed or injured. As a general proposition, a plaintiff is entitled to recover all damages which naturally follow the commission of a tort, but in this case, as hereinbefore stated, the dwelling, other than the foundation, was completely destroyed; the ornamental and shade trees for which compensation was sought were rendered of no value by the fire and while damages cannot be based upon conjectural and uncertain estimates, still in a proper case where substantial damages have been suffered, they will not be denied simply because they cannot be determined with absolute certainty.

During the cross-examination of Mr. Hout, an employee of appellant, he stated that he removed the meter from the basement and further testified that he was required to report to appellant every hour as to what he did. Counsel for appellee then asked him: "Is that the time you were telling them if they did not give you five dollars for the meter you would let it burn?" Counsel for appellant thereupon objected, stated to the court that such a question was improper and moved to withdraw a juror and continue the case. The court denied the motion and the examination proceeded. The asking of this question was highly im-

452

proper, prejudicial and without justification. Counsel will undoubtedly be governed more by the proprieties of his profession upon another trial of this cause.

For the reasons indicated, the judgment of the circuit court is reversed and the cause remanded.

*Reversed and remanded.*