Harry L. Dixon and Sabina E. Dixon, Plaintiffs-Appellees, v. Montgomery Ward and Company, Inc., Defendant-Appellant.

Gen. No. 10,638.

Opinion filed July 2, 1953. Rehearing denied July 31, 1953. Released for publication August 3, 1953.

ALLEN, MATTHEWS, JORDAN & DEAN, of Aurora, for appellant; G. E. JORDAN, and OLNEY C. ALLEN, both of Aurora, of counsel.

WILLIAM C. O'BRIEN, of Aurora, for appellees; WILSON D. BURNELL, DONALD L. PUCKETT, and JOSEPH H. BARNETT, all of Aurora, of counsel.

MR. JUSTICE ANDERSON delivered the opinion of the court.

Harry L. Dixon and Sabina E. Dixon, his wife, plaintiffs appellees, hereinafter referred to as plaintiffs, brought suit in the circuit court of Kendall county against Montgomery Ward and Company, hereinafter referred to as the defendant. The plaintiffs alleged that they lost their home and its contents by the over-

heating of a furnace purchased from the defendant. In a trial before a jury a verdict was returned in favor of the plaintiffs. The court overruled motions for a new trial and for judgment notwithstanding the verdict and entered judgment on the verdict. This appeal follows.

The complaint consisted of two counts. The first count alleged that in late November 1949, plaintiffs purchased from the defendant an automatic oil-fired furnace which was warranted to be fit for heating purposes of the plaintiffs' home in that it was mechanically perfect, safe and fit for this use; that the furnace due to its defective construction was a dangerous instrumentality; that the defendant agreed to install the furnace; that the defendant installed the furnace in a negligent and careless manner; that on several occasions prior to April 27, 1950, the furnace became overheated due to the negligent manner in which it was installed or due to its defective condition; that as a result thereof, a fire was started which consumed the plaintiffs' home and its contents for which the plaintiffs asked damages; and that at all times the plaintiffs exercised due care for the safety of their property.

Count two of the complaint alleged in substance the same material facts as count one except that count two did not allege that there was a contract to install the furnace. The defendant by his answer denied the allegations of the complaint and liability.

In the latter part of November 1949, Harry L. Dixon went to the Montgomery Ward store at Aurora, Illinois, in the vicinity where he resided, and purchased the furnace in question recommended by the defendant. A sales contract was signed by the parties. The contract prior to its execution consisted of a printed form. The data necessary to cover the details of this contract were typed in prior to its signing. All the typed addi-

tions appeared on the first page. Above the signature of Harry L. Dixon there was typed, "install in workmanlike manner." On the back of the contract there appeared in fine print what are designated as conditions of the contract. The substance of these conditions was that the defendant warranted the furnace to be free from defects in material and to give satisfactory service when properly installed. The price of the furnace included the installation. After Dixon signed the contract, the defendant without the knowledge or consent of the plaintiffs procured Merle Pruter to install the furnace. Pruter later signed an installation agreement which was contained in the same contract. Pruter installed the furnace. There is no complaint concerning the installation except as to the electrical devices. The furnace was manufactured to be fired by oil. All the electrical devices and connections within the furnace itself had been installed by the manufacturers at the factory. The testimony shows that these electrical devices which regulated the furnace had been properly installed and were not defective when the furnace left the factory; that it was necessary for the electrician to extend a wire from an outlet to a thermostat and from the thermostat to an electric service line; that the electrical devices on the furnace controlled the flow of oil into the furnace and the thermostat controlled the temperature of the house. The uncontroverted testimony of witnesses for the defendant shows that if the wires were not connected properly to the outlet on the furnace, the furnace would not work automatically. The furnace could be operated manually.

Joe Trettenero, an employee of Pruter, did the electrical wiring on the furnace when it was installed. He testified that he wired the thermostat and the outlet to the power line with the help of an owner's guide prepared by the defendant; that he had considerable

80

experience in wiring this type of furnace and had wired several of them for the defendant. There is no evidence, unless the overheating of the furnace and the later fire is considered, that he did not wire the furnace properly.

The furnace was also equipped at the factory with a limit or heat control inside the jacket of the furnace. This control had a maximum temperature setting of 250° F. If the furnace reached the 250° temperature and the limit control was working, the furnace would automatically shut off.

The installation of the furnace was completed about December 8, 1949 and it worked satisfactorily for two or three weeks. Plaintiffs' house throughout the winter prior to the fire was being remodeled. A power saw was used which caused considerable dust in the house. After the furnace had been installed, the plaintiffs constructed around the plenum or heat chamber at the top of the furnace two by fours to which a ceiling of plywood was nailed. The heat ducts from the plenum chamber are equipped with filters and if these filters are clogged, the hot air will remain in the plenum chamber and will cause the furnace to become overheated. The filters ordinarily require no cleaning for about a year after installation, but if there is excessive dust and dirt, they may become clogged within a short period of time. The furnace may be operated manually by pulling up a button at the bottom of the furnace. When this is done, the thermostat control is cut out as well as the limit control, both of which are electrically controlled. The plaintiffs received an owner's guide from the defendant. This guide informed the owner concerning the operation of the furnace. After the furnace did not operate properly, Harry L. Dixon and his father attempted to adjust the furnace. The testimony does not disclose what they did except they

remembered using a screw driver. There is no device to shut off the furnace except to shut off the fuel. There is a valve near the bottom of the furnace which can be operated to regulate the amount of oil going into it. This valve is numbered from one to six and when the valve is turned to six, the maximum heat of the furnace is obtained. After several weeks of satisfactory operation, Harry L. Dixon and his father both noticed that the furnace appeared to be sooting a great deal and that the thermostat failed to control the temperature. Harry C. Dixon, the father, testified that he told Mr. Bowman about these conditions. This was about two months prior to the fire. Bowman testified that he agreed to go out and look at the furnace and that he was out there on two or three occasions but finding no one at home, he did not inspect it. It appears from the defendant's witness and is not contested, that the smoking or sooting of the furnace could have arisen from many causes, among them lack of oxygen, lack of ventilation, poor oil, and poor mixture of the oil and the air in the combustion chamber, and that if a large amount of black smoke came out of the chimney, as testified to, this would indicate that the furnace was being operated by manual control. The uncontroverted testimony of defendant's witnesses established that the ignition temperature of wood varies with its density in moisture content; that a two by four or plywood when brought in close contact with the plenum chamber will dry out and char; that this will lower the ignition temperature down to as low as 190°; and that plywood or two by fours should be at least six inches from a plenum chamber.

On December 8, 1949, Harry L. Dixon signed a written acceptance which stated that the furnace had been satisfactorily installed, and in the same instrument

82

Merle Pruter certified that he had completed the installation and Bowman for the defendant certified that he had inspected the premises and found the furnace completely installed. After the house burned, the plaintiffs paid the defendant the balance due on the contract.

Walter S. Henry, a neighbor of the plaintiffs, testified that in March 1950, early in April 1950, and again later, he noticed black smoke coming out of the Dixon chimney. There was no one at home; so he went into the house and turned the oil off at the oil barrel. The house was very hot and he smelled an odor of hot pine. On each occasion, Mr. Henry told Harry L. Dixon about this.

Harry L. Dixon testified that the furnace was put into operation the latter part of December or the early part of January and that he started it after Mr. Bowman had told him how to do so; that he noticed excessive sooting some time in January and that he and his father tried to make some adjustments with the help of the instruction book, but they were not able to get a satisfactory flame to prevent the sooting; that he had talked to Mr. Ryback, who was employed in the building department of the defendant's store, about the furnace, that at times, although he does not remember the exact dates, the house would get extremely warm although the thermostat was set at 72°; that the thermometer at the thermostat was higher than the thermostat and he turned it down and the house seemed to cool off; that he had told Bowman some time in January that the thermometer and the thermostat did not coincide; that he mentioned to Bowman the sooting of the furnace; that on the night of the fire he noticed the belching of the soot coming out of the furnace door; that he saw that the flame in the furnace was extremely high and the soot was going throughout the utility

room; that he turned the thermostat down to about 50° or 60°; that the furnace appeared to subside after he turned the thermostat down; that he retired and he woke up to find the house full of smoke; that he ran to the utility room and observed that the flames were eating around the plenum in the utility room ceiling; that his home and all its contents were consumed by the fire. On cross-examination he testified that he noticed that the thermostat did not shut the furnace down; that he did not believe this happened more than twice; that he only noticed the furnace overheating once or twice; that he met Bowman and Ryback in the City Hall Pharmacy after Mr. Henry had noticed the furnace heating up and he told Ryback what had happened—that the furnace had overheated; that Ryback said he would have to get out and make some adjustments; that Dixon never put any new filters in the furnace but that he had inspected them once or twice but did not clean them; that he had never heard from Bowman or Trettenero; that he had nothing to do with selecting Pruter or Trettenero to install the furnace; that the fair cash market value of his home before the fire was $8,000 and that after the fire, there was no value except the lot which was worth $350.

Harry C. Dixon, father of Harry L. Dixon, testified that he had helped his son remodel the home; that at one time, seeing that the furnace was overheating, when he thought the thermostat was set at 60°, he had discussed the furnace conditions, the sooting and overheating, with Bowman and Ryback in the defendant's store in Aurora. On cross-examination he testified as to the construction of the two by four's and the ceiling over the plenum and said that only on one occasion did he think the furnace was too hot.

84

Garr S. Bowman was called as an adverse witness by the plaintiffs under section 60 of the Civil Practice Act [Ill. Rev. Stats. 1951, § 184; Jones Ill. Stats. Ann. 104.060]. He subsequently testified for the defendant and was further cross-examined by the plaintiffs. He testified that he had special training as a furnace engineer. He fully described the furnace and its electrical devices; that he had inspected the furnace two or three times prior to the time it was accepted by the purchaser; that Dixon never complained to him about the furnace; that he asked him to look at it to see if it needed any adjustment to prevent sooting; that his father complained about the furnace, stating that it was making too much smoke; this was after Bowman had talked to Harry L. Dixon; that no complaint was ever made to him by anyone about the furnace overheating; that he never inspected the furnace after the wiring was completed nor did he ever inspect the wiring because he had no knowledge on this subject.

Farley James Wilkinson testified as a witness for the defendant that he was in charge of the sales engineering department of the defendant's Chicago office. After some testimony as to the operation of the electrical devices on the furnace, he further testified that the recognized standards of safety required a minimum of six inches between the top of the furnace and the wood or plywood; that if insulating material was used, three inches would be safe.

■ The defendant argues that Wilkinson and Bowman were wrongfully permitted to testify as adverse witnesses under section 60 of the Practice Act. This section of the Practice Act provides in substance that if the witness is a "managing agent" of any party corporation that he may be examined as if under cross-

85

examination by the adverse party. Wilkinson's testimony was stricken by the court; so whether or not he was a competent witness under section 60 is immaterial.

Section 33 of the Municipal Court Act (Ill. Rev. Stat. 1952, chap. 37, par. 388 [Jones Ill. Stats. Ann. 108.056]) has a similar provision permitting cross-examination of a witness if he is a *"managing agent"* of the corporation. A sales agent at a branch office of the defendant who was in charge of several employees who made the contract involved was held to have been properly called under the above section of the Municipal Court Act. (*Paris Flouring Co. v. Imperial Cotto Milling Co.*, 181 Ill. App. 215.) Under the same statute, it has been held that a local agent of an insurance company was a proper adverse witness. (*O'Connor v. Maryland Motor Car Ins. Co.*, 287 Ill. 204.) `In the instant case Bowman was head of the heating department of defendant's store at Aurora and had *supervision* and *control* of some people in his department. He submitted the contract to the plaintiffs and had charge of installation of the furnace. We think he was a "managing agent" of the defendant corporation and was properly called as an adverse witness for cross-examination.

The defendant assigns as further error that over objections the plaintiff was permitted to interrogate witnesses concerning the Langhart furnace. It appears from the abstract of the testimony that Leslie Langhart, a neighbor of the plaintiffs, near the same time of the purchase of the furnace by the plaintiffs had purchased a similar furnace from the defendant. Both furnaces were oil fueled. Both used the same type of thermostat control and the built-in electrical apparatus was identical. Leslie Langhart testified that Trettenero who did the electrical work on the Dixon furnace also did this work on his furnace; that he was there while Tret-

86

tenero was wiring his furnace and that he seemed somewhat confused and he gave him the instruction book furnished by the defendant to help him wire it. Trettenero said, "This job is wired up wrong." He then proceeded to wire it. He further testified that when his furnace was installed it did not work properly and that Mr. Bowman was out several times to work it over; that in the presence of Bowman, Trettenero said, "This furnace is wired up wrong." It appears that the difficulty with the Langhart furnace was that it did not heat; that Bowman blew out the oil line; that it had not gone out but still did not furnish sufficient heat; that after that the furnace, Langhart testified, "worked alright; perfect." He further testified that he did not remember Bowman finding the thermostat dirty, but that they messed with the thermostat. Over objection of counsel, while Bowman was being examined under section 60, he was permitted to testify concerning the Langhart furnace. He testified that he was at the Langhart's on several occasions and that he blew out the fuel line that Langhart had testified about; that one time when he was at the Langhart home he found the thermostat had plaster in it which kept it from working properly; that he put a new thermostat on the wall and after he had blown out the oil line and replaced the thermostat, he had no more complaints from Mr. Langhart. It appears from the testimony of all witnesses that after the oil line was blown out and the new thermostat installed, the Langhart furnace worked perfectly. Defendant urges that the admission of this testimony is reversible error. He alleges that this testimony prejudiced the jury in that because the Langhart furnace did not operate efficiently, they may have concluded that the plaintiffs' furnace was negligently installed, mechanically imperfect, and not fit for the use for which it was intended. It appears to us that

87

the conditions existing around the installation of the Langhart furnace are entirely different from those surrounding those of the Dixon furnace. The fact that admitting the Langhart furnace was wired wrong at the factory or by the electrician did not tend to prove or establish that these facts were true concerning the Dixon furnace. In fact the evidence discloses no defect of the wiring in or outside the Langhart furnace that caused it not to heat. *Lathrop-Paulson Co. v. Perksen,* 229 Ill. App. 400, was a suit to recover the purchase price of an alleged defective bottle-washing machine sold to the defendant. Defendant offered to prove that similar bottle-washing machines failed to operate properly. The court held that this evidence was properly excluded. Other cases holding this type of testimony as not admissible are: *Moulton v. Gibbs,* 105 Ill. App. 104; *Lander v. Sheehan,* 32 Mont. 25, 79 Pac. 406; *Boviard & Seyfang Mfg. Co. v. Maitland,* 92 Ohio St. 201, 110 N. E. 749.

Plaintiffs contend in the instant case that the ·evidence discloses that after both furnaces were wired by Trettenero neither operated properly and therefore the evidence was admissible. He urges that the evidence discloses that the Langhart furnace became overheated. We have examined the abstract and the additional abstract filed by the plaintiffs and can find no evidence anywhere that states that the Langhart furnace ever became overheated. Langhart did testify that the furnace had its "ups and downs," but nowhere did he testify that it ever became overheated. In our opinion, conceding the fact that the Langhart furnace was wired improperly at the factory or by Trettenero, did not create a presumption or inference or tend to prove that the Dixon furnace was likewise wired improperly. We think the admission of this evidence was highly prejudicial to the defendant and it requires reversal of this case.

 Defendant further argues that the written contract of purchase states that he is not liable for any damages caused by defect of installation and that the installers are agents of the plaintiffs and to hold otherwise violates the parol evidence rule. The weakness of this argument is that the typed portion of the contract states "install in workmanlike manner." The typed portion of the contract prevails over the printed portion in determining its construction. (*Hungate v. New York Life Ins. Co.*, 267 Ill. App. 257.) The defendant prepared the contract and in case of ambiguity, it should be construed in favor of the plaintiffs. The testimony fully supports this construction that the defendant agreed to install the furnace. The plaintiffs had nothing to do with the installation of the furnace. The installers were hired and paid by the defendant. The acts of the parties and the language of the contract fully establish that the company did agree to install the furnace and any faulty or defective installation would come within the warranty of the agreement. This construction is reasonable, what is shown to have been intended by the parties, and supported by the evidence.

 Defendant further argues that the payment of the balance due under the contract after the fire waived all rights of the plaintiffs to recover. This would be a circumstance for the jury to consider, but in our opinion would not be conclusive against the plaintiffs when they bring suit and would not bar their recovery. We do not regard the cases cited by the defendant to be controlling as the facts are entirely different. We deem this contention to be without merit.

 The defendant argues that the trial court committed error in giving and refusing various instructions. Defendant's refused instruction No. 1 in substance told the jury that if they believed that the plaintiffs on December 8, 1949, delivered to the defend-

89

ant an acceptance statement to the effect that the furnace had been satisfactorily installed that this fact would prevent recovery. In our opinion the fact that plaintiffs accepted the furnace did not prevent recovery if they later found out that the furnace was defective. This instruction was properly refused.

██ Defendant's refused instruction No. 3 told the jury that the plaintiffs could not recover if they believed that the defendant was not negligent in installing the furnace. This instruction is peremptory in form and directs a verdict and wholly ignores the fact that the plaintiffs might recover as alleged in their complaint, that the fire was caused by a defect in the furnace itself. For this reason this instruction was properly refused.

██ Defendant's refused instruction No. 4 in our opinion was properly refused in view of the fact that the court modified it and gave it as modified. The elements deleted by the court are contained in the modified instruction.

██ ██ Defendant's refused instruction No. 5 in substance stated that if the jury believed that the furnace, due to its defective construction, became a dangerous instrumentality and that the plaintiffs had knowledge of such condition and continued to use it, then they could not recover. This instruction is also peremptory in form and directs a verdict and it must stand and fall on its own language and is not aided by other instructions. In fact, it tells the jury as a matter of law that the plaintiffs cannot recover if they knew of the defective condition of the furnace and continued to use it. This instruction did not properly tell the jury what acts or omissions would constitute contributory negligence. (*Chicago & Eastern Ill. R. Co. v. Huston,* 196 Ill. 480.) This invades the province of the jury. We think this instruction was properly refused.

90

For the same reasons defendant's refused instruction No. 6 was properly refused.

■ Defendant argues that plaintiffs' given instruction No. 1 should not have been given. This instruction tells the jury that the number of witnesses testifying for either party does not necessarily determine the preponderance of the evidence and that they may consider such question and that the evidence of a smaller number cannot arbitrarily be taken in preference to a larger number unless the jury can say that the smaller number is more credible. The instruction is somewhat long and involved. Regardless of this the identical instruction was approved by the Supreme Court in *Gage v. Eddy*, 179 Ill. 492. We think under this case that the instruction was properly given.

■ Plaintiffs' given instruction No. 5 advised the jury that a preponderance of the evidence may be established by circumstantial evidence considered with the other evidence in the case. In our opinion there was circumstantial evidence in this case which warranted the giving of this instruction. (*United States Brewing Co. v. Stoltenberg*, 211 Ill. 531.)

■ Defendant argues that plaintiffs' given instruction No. 7 was erroneous because it did not require that the negligence of the defendant be limited to that charged in the complaint. In our opinion the error of this instruction which did not direct a verdict is cured by defendant's given instruction and other instructions which told the jury that the plaintiffs must establish by a preponderance of the evidence that the burning of the house was proximately caused by the specific negligence alleged in the complaint.

■ Defendant further contends that plaintiffs' given instruction No. 6 erroneously instructed the jury as to the measure of damages. It told the jury that the correct measure of damages is the difference in

91

value of the real estate immediately before and immediately after the fire. This court has held in *Clark v. Public Service Co.*, 278 Ill. App. 426 and in *Johnson v. Pagel Clikeman Co., Inc.*, 343 Ill. App. 346, that where improvements on real estate are totally consumed by fire, as in the instant case, the measure of damages is that stated in this instruction. This instruction was properly given.

We believe that the jury was properly instructed as to the law in this case.

The defendant further urges that the conduct of plaintiffs' counsel while attempting to introduce into evidence a pamphlet or circular printed and circularized by the defendant constituted error. It appeared that the circular was not in existence at the time of the purchase of the furnace and further that the plaintiffs had never seen it. The court asked the plaintiffs' counsel the purpose of the document. The counsel then proceeded to read in the presence of the jury from the back of the pamphlet as follows: "This document is an advertising circular put out by Montgomery Ward; the purpose is on the back cover—'Let Montgomery Ward install your furnace. Expert installation.' The advertising on the book cover is material for our purpose, that Montgomery Ward & Co. installed the furnace." The court refused to admit the catalogue in evidence. The court was not asked nor did he on his own motion instruct the jury to disregard the above statement of counsel. We agree with defendant's attorney that the catalogue was wholly incompetent and that plaintiffs' counsel's statements were improper and could have prejudiced the jury. As suggested by defendant's counsel the statement was more prejudicial than if the catalogue had been admitted into evidence. The jury might have inferred both that the defendant had agreed to install the furnace in ques-

tion and also that they advertised that they were expert installers. While the above error by itself might not be deemed sufficient to reverse the case, taken with the other errors, we think it should be noted in this opinion. Other objections are made to prejudicial remarks by plaintiffs' counsel. If well taken or not, and as they are not apt to occur at another trial, we do not deem it necessary to pass upon them.

██ ██ Defendant next argues that the plaintiffs as a matter of law were guilty of contributory negligence and that the court should have entered judgment notwithstanding the verdict or in the alternative the court should have awarded the defendant a new trial. In effect, defendant contends that the plaintiffs' use of the furnace after they had knowledge that it overheated, constituted contributory negligence which would bar plaintiffs' recovery. An analysis of the testimony shows that the plaintiffs knew that the furnace was overheating and complained to defendant's agents about it and tried to obviate the defects themselves, and although it was not examined by anyone, they continued to use it up to the time of the fire. Contributory negligence generally speaking is a question of fact for the jury, and the jury's determination is final unless it is manifestly against the weight of the evidence. (*Lasko v. Meier*, 394 Ill. 71.) As said in the *Illinois Central R. Co. v. Oswald*, 338 Ill. 270, "A party has no right to knowingly expose himself to danger and then recover damages for an injury which he might have avoided by the use of reasonable precaution." The undisputed testimony is that the plaintiffs, claiming that the furnace was a dangerous instrumentality and well-knowing that it had overheated on several occasions so far as to cause the smell of burning wood in the house and knowing it was defective continued to use it. We do not think that contributory negligence was

established as a matter of law. The verdict of the jury necessarily had to find that the plaintiffs were free from contributory negligence. We believe that their verdict is manifestly against the weight of the evidence and should not have been permitted to stand.

 The defendant earnestly urges that the plaintiffs have not established by a preponderance of the evidence that any negligence of the defendant was the proximate cause of the fire. The burden of proof was on the plaintiffs to establish this. Plaintiffs cite *Lindroth v. Walgreen Co.*, 338 Ill. App. 364, affirmed by the Supreme Court in 407 Ill. 121. In these cases the courts permitted a baby, badly injured from a fire caused by a defective vaporizer, to recover against the seller and the manufacturer. The court held that the jury was warranted in finding that the vaporizer was a dangerous instrumentality. In that case there was no eyewitness to the fire. The Appellate Court said:

". . . As we said in *Plodzien v. Segool*, 314 Ill. App. 40, the law is that where 'uncertainty arises as to the inferences that may legitimately be drawn from the evidence so that fair-minded men may honestly draw different conclusions, the question is not one of law but one of fact to be settled by the jury.'" (Authorities cited.)

 We believe as reasonable men the jury might have concluded, based on substantial testimony, that the cause of the fire was the defective heat control in the furnace. It is clear that the electrical devices on the furnace were working at the time that Harry L. Dixon retired. He stated that he had reduced the thermostat and the furnace cooled off and that some time later he observed the flames around the plenum chamber. The jury may have reasonably concluded that a defective heat control did not reduce the heat as it was warranted to do. We cannot say as a matter of law that

94

the plaintiffs failed to prove that the defendant was negligent and that his negligence was not the proximate cause of the fire. The jury's verdict so far as these necessary findings are concerned must be inferred from their verdict and it is not manifestly against the weight of the evidence.

For the above reasons it is our conclusion that the trial court erred in not granting the defendant a new trial and judgment of the trial court is reversed and remanded accordingly.

*Judgment reversed and cause remanded.*