INDIANA HARBOR BELT RAILROAD COMPANY, a corporation, and the Baltimore and Ohio Chicago Terminal Railroad Company, a corporation, Plaintiffs,

v.

SOO LINE RAILROAD COMPANY, a corporation, Defendant and Counter-Plaintiff,

v.

INDIANA HARBOR BELT RAILROAD COMPANY, a corporation, Counter-Defendant.

No. 65 C 2217.

United States District Court, N. D. Illinois, E. D.

June 25, 1973.

Winston & Strawn, Chicago, Ill., Frank L. Butler, John H. Gobel, Gen. Counsel, Baltimore and Ohio Chicago Terminal R.R. Co., Chicago, Ill., for plaintiffs Indiana Harbor Belt R.R. Co. and The Baltimore and Ohio Chicago Terminal R.R. Co.

Marvin F. Metge, Gorham, Adams, White & De Young, William H. Schrader, Heineke, Schrader & Cuncannan, Chicago, Ill., for defendant Soo Line R.R. Co.

## MEMORANDUM AND OPINION CONCERNING CERTAIN DAMAGE ISSUES

ROBSON, Chief Judge.

This litigation arises from the collapse of one span of a railroad bridge over the Chicago Sanitary and Ship Canal owned by the plaintiff railroads on June 19, 1964.[1] Previous rulings of this court have limited plaintiffs' claims for damages to those arising from the Trackage Agreement (Agreement) between the Indiana Harbor Belt Railroad Company (IHB) and the predecessor of the Soo Line Railroad Company (Soo), dated November 20, 1959. In particular, paragraph Fifth (c) of the Agreement has been held to govern this suit on the basis of "the facts thus far adduced." The parties now request advance determination of damage issues arising under the Agreement in order to clarify the issues and to simplify further proceedings. This court agrees that an advance ruling would be advantageous.

The first issue to be decided is the proper construction of paragraph Fifth (c). In essence, that provision declares that all liability for property damage or personal injuries connected with the use of the covered trackage and facilities shall, regardless of fault, be assumed by each party as to its own property, employees, passengers, and bailments. However, all damage to joint property and employees, or to third persons is to be shared equally.[2] The only joint property (defined in paragraph Fifth (a) as "all property used jointly") here involved is the collapsed span of the bridge.

The Soo argues that the provision for each party assuming *all* damage to its *sole* property precludes an IHB claim for any expense except damages to the bridge itself, since by definition such expenses involved the sole property of the IHB. Soo contends that expenses of the IHB resulting from the collapse, such as detour and additional crew costs, are merely consequential damages to its franchise and business and therefore not recoverable under the Agreement, as they constitute damage to the sole property of the IHB or are incidental to such damage. The IHB, on the other hand, contends that the Agreement

"clearly states that the term 'damage' as used in the Agreement embraces not only loss of or damage to property but expenses incidental thereto as well. It is the IHB's basic position that certain of the expenses incurred by it are expenses incidental to the damage to the bridge and thus to be apportioned under paragraph Fifth (c) of the Agreement."

Both parties have focused exclusively upon paragraph Fifth (c) and constructed a plausible argument based upon a portion of it. Obviously, resolution of the dispute must proceed from an analysis of the scope and purposes of the

1. There is much material in the record concerning the exact relationship between the plaintiffs. However, as the issue is not relevant to this opinion, they will be treated as joint owners of the bridge for the sake of convenience.

2. Paragraph Fifth (c) reads as follows:
   "FIFTH: The apportionment of liability for all loss of or damage to property and injury to or death of persons and all expenses incidental thereto including the obligation to pay compensation or any other obligation arising under any occupational disease law or any other state or federal law (all hereinafter collectively referred to as 'damage') in any manner originating or occurring upon or in connection with the operation or maintenance of the property and facilities covered by this agreement, shall be governed by the following provisions:

   "(c) When such damage arises under conditions where the trains, cars, or motive power of both parties hereto are involved, with or without the trains, cars, or motive power of other railroads, each party hereto as between themselves, shall irrespective of fault, assume all damages to its sole property and employees and to passengers and property in its care or custody, except that damage to joint property, joint employees and third persons, shall be apportioned equally between the parties hereto."

entire liability provision. 3 A. Corbin, CORBIN ON CONTRACTS § 549 (Rev. ed. 1960).[3]

The crux of the Agreement is that the parties plainly agreed to substitute for the imprecise and often contentious principle of liability for fault or negligence their own principle of liability based upon the "involvement" of the trains, cars, or motive power of one or both of them. Thus, paragraph Fifth (b) manifests an intent that when only one party is involved in an occurrence, that party shall bear all damages involved, whether to its own property or employees, to third persons, or to joint property or employees.[4] While damage to the sole property of the party not involved is not explicitly mentioned, such expenses as are here in dispute must be deemed to be included within the scope of or to be incidental to damage to joint property and employees. Otherwise, the provision of sub-paragraph (c), which provides that when the trains of both parties are involved, each shall assume all damages to its sole property, becomes superfluous because such damages would be born whether or not the party's train was involved.

■ As the Agreement defines the term in sub-paragraph (a), "joint" property—and expenses incidental to damage to joint property—must have precisely the same meaning in both sub-paragraphs (b) and (c). So construing the terms of the Agreement, its apparent intent to apportion liability without affecting the scope of damages which might arise from such liability becomes clear. The rules of apportionment so adopted can be summarized thusly:

(1) If one party only is involved, that party assumes all damages to its own property, employees, passengers, and to joint property and passengers and employees, and to third parties and assumes all expenses naturally and probably resulting from such damages in accordance with the applicable rules of law, which are not modified by the Agreement.

(2) If both parties are involved, each assumes all damages to its sole property, passengers, and employees and all expenses which result from such damage. All damages to and expenses resulting from damage to joint property, passengers, and employees and to third parties shall be shared equally.

■ The applicable law governing the scope of damages is, of course, that of Illinois because jurisdiction in this action is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332. The leading Illinois case in the ". . . untried and uncharted field of [the] law" of damages resulting from injury to a fixture or structure on real property appears to be Central Illinois Light Co. v. Stenzel, 44 Ill.App.2d 388, 394, 195 N.E. 2d 207, 210 (1964) (appeal denied).[5] In Stenzel plaintiff's damages for a broken utility pole were limited to labor costs including regular and overtime rates, fringe benefit labor costs, operating expenses for equipment, and material cost less a percentage of that cost equal to the percentage of the life expectancy of the pole remaining at the time of the damage. Store expense, supervision, and

3. "Consideration of the rule reduces it almost to a truism; but its statement is useful . . . ." A. Corbin, CORBIN ON CONTRACTS 522 (One volume ed. 1952).

4. "(b) When such damage arises under conditions where the trains, cars or motive power of one only of the parties hereto are involved, with or without the trains, cars, or motive power of other railroads, that said party shall, irrespective of fault, assume all damage to its sole employees, to passengers and property in its care or custody, to joint property and joint employees and to third persons."

5. The Illinois court in Stenzel declined to follow the relevant federal authority, Baltimore and Ohio Railroad Co. v. Commercial Transport, Inc., 273 F.2d 447 (7th Cir. 1960), on the grounds that it did not correctly apply Illinois law.

general overhead were disallowed as being too remote and not being attributable to the fault of the defendant.[6]

■ Most of the items listed in the summary of IHB recapitulation of expenses appear to be expenses incurred as a result of the damage to the bridge rather than the ". . . fixed and continuing expenses of operation that are in no way dependent upon and bear no relation to . . . [the damage] and in no way flow as a natural or proximate result of . . . [the damage]." *Id.* at 398, 195 N.E.2d at 212. Such items of expense would include, for example, detour expenses, additional crew costs, and pilot expenses and must be apportioned in accordance with paragraph Fifth (c). Some expenses, however, are concededly damage to the sole property of IHB or relate to such damage, for example, damage to the IHB locomotive and to the cars of other railroads and loss of livestock which must be assumed by the IHB. However, this court cannot determine any category of expense definitely is or is not the proximate result of the damage to the bridge on the basis of the limited information now before it. If Soo believes that any IHB expense is not a proper element of damages under the standard herein outlined, it may raise specific objections to it.

The second issue to be decided is the proper measure of damages for the collapsed span of the bridge. IHB contends that it will not be made whole unless the amount of damages to be apportioned is the sum of the costs of the temporary span now in service and a permanent span which must eventually replace the present one. Soo advances several contentions which limit the amount of the recovery against it.

Primarily, Soo argues that there is no necessity that the present span will ever have to be replaced at all and, therefore, that damages are limited to the actual costs of building it. The possible necessity of replacement arises from the fact that the bridge was originally a swing truss with each span connected to a center pier creating two navigable channels in the canal. Although the swing mechanisms were abandoned in place by the Navy Department in 1962, the bridge had not, prior to the accident, obstructed the navigation of the canal since its creation except for the center pier, and all parties agree that any improvements required by the government for purposes of navigation would have been compensable.

However, at the time of the accident, the summer of 1964, the collapsed span could not be restored to its pristine condition of not impairing navigation in less than six months because of a shortage of steel of the type needed to rebuild the same type of bridge. The bridge is part of IHB's only through route between its yards in the southern sector of the Chicago metropolitan area and its connections in the northern and western sectors. It is also used by several other railroads. Rather than wait for the proper type of steel to become available at the cost of great sacrifice to itself and of disruption to rail service, IHB constructed a temporary bridge from readily available materials. The new bridge was not expected to be permanent because a supporting bent in the center of the right draw was necessary for its support. In addition to being permanently fixed, the extra bent completely blocks navigation of one portion of the canal.

The parties have submitted correspondence with the various governmental

6. IHB argues that *Stenzel* is inapplicable because the court discussed and applied general rules applicable to damage to personal property while this suit involves damage to a structure on real property. However, the court explicitly declared that the personal property rules ". . . do not reach the legal questions arising in this case." 44 Ill.App.2d at 395, 195 N.E.2d at 211. This court can discern no reason to distinguish damage to a utility pole disrupting the service of the utility from damage to a railroad bridge disrupting the service of the railroad. In both cases, whatever the property law classification may be, a structure or fixture is embedded in real property for the purpose of providing a regulated public service.

authorities regarding the character of the new bridge as an obstruction to navigation. The earlier items need not be described in detail because they unequivocally support IHB's contention that the bridge is temporary in nature and must be replaced at some time by a non-obstructive structure. Replacement of a temporary bridge built for the convenience of the railroad would, of course, be non-compensable. However, after considerable urging by IHB that the new bridge should be considered a permanent structure, the Corps of Engineers in 1967 adopted a more lenient position:

> "Restoration of the pre-June 1964 status .quo will not be required at this time in the absence of a substantial showing that the hinderance to waterway traffic is not only real and economically costly but also that it exceeds the hinderances which exist elsewhere in the same canal. However, I have been directed to pursue further with you the matter of reaching an agreement whereby the Baltimore & Ohio will modify its bridge to meet the national defense requirements of the Navy in the event such becomes necessary in the future."

Soo contends that the government's present attitude makes the necessity of altering or replacing the existing bridge speculative and conjectural, and cites numerous cases which hold that damages of this nature are not recoverable. IHB, on the other hand, argues that in the first place its right to recovery is not governed by the possibility of governmental action but by the legal principle that an injured party must be restored to its status prior to the injury, that is, the possessor of a movable, non-obstructive bridge. In the second place, IHB contends that the position of the Engineers does not preclude and would actually require future replacement of the bridge.

Assuming *arguendo* that restoration of the status quo is the proper measure of damages, that concept must be broadly and sensibly interpreted. In the case at bar, the status quo consisted of a functional, legal railroad bridge. Its movability or its support by a bent in one channel of the canal are irrelevant to its purpose and to its value to IHB. Were the government to declare the bridge in its present configuration to be a "permanent" structure, IHB candidly admits that it would abandon its claim for replacement because the existing span is in every way adequate as a railroad bridge and, in fact, meets higher performance standards than the other original span which was not involved in the accident. Under these circumstances, replacement of the existing temporary span as the proper measure of damages unless required by governmental regulatory action would constitute gross waste and economic inefficiency of the highest order. Unless the government chooses to act, IHB does not need a movable bridge without a center bent any more than the John Hancock Building needs hitching rails.

Thus, the crucial element is the possibility of governmental action. IHB concentrates upon the authority of the government to act, and its argument is best summarized by one sentence of its reply brief: [t]here is no doubt that the government authorities are in a position at any time to demand the return of this bridge to its original configuration." Soo, while disputing the power of the government to act without compensating the owners of the bridge, grounds its position on the improbability that the government will actually do so:

> ". . . [T]he possibility of governmental action is itself a mere possibility. Inaction over a period of more than four years creates the only reasonable inference that governmental action will not be taken. If governmental action is taken [,] then the outcome of any such proceedings is purely a matter of conjecture."

This court is of the opinion that Soo's position is well taken. In addition

to the September, 1967, letters previously mentioned, the last communication from the Corps of Engineers in May of 1968, summarizes the outcome of the conferences and correspondence of the parties as requiring "subject to be made movable or to be removed no later than the time all of the downstream bridges are either in fact movable or otherwise provide the clearance which the Navy states to be necessary." These documents seem to indicate that, whether or not the government retains the authority to order the temporary bridge and its obstructions removed without compensation, there is no substantial likelihood that the power will ever be exercised. This court cannot in good conscience permit an award of damages for replacement of a bridge which may well never require replacement. Unless IHB makes an appreciably stronger showing of probable noncompensable action by the government to require replacement of the present span, evidence of costs of removing or altering it in order to obviate its character as an obstruction to navigation will be excluded at trial.

Besides asserting that the expenditures for the replacement span constitute ceiling on possible damages, Soo also contends that the actual value of the bridge at the time of its demise must be the measure of IHB's recovery.

■ The sole Illinois case involving damage to a bridge appears to be County of Bond v. State, 22 Ill.Ct.Cl. 429 (1957). Full recovery was allowed, but whether the basis for the judgment was the ac-

tual value of the bridge or the cost of repairs is not apparent. However, the opinion does clearly intimate that when the age of the structure can be established, normal depreciation can and should be taken into consideration.

■ The Illinois cases dealing with damages to real property and to structures on real property in general are not altogether consistent.[7] Cameron, Joyce & Co. v. McLouth, 70 F.2d 6 (7th Cir. 1934). In *Cameron*, the Court of Appeals concluded that Illinois law distinguished between injuries essentially to the freehold and injuries primarily to buildings and that

". . . where the extent of the loss occasioned by the destruction of the building is the issue, it would seem more productive of fair and rational verdicts to limit the field of investigation to original and reproduction cost prices of the building, its depreciation through wear and tear, and to evidence showing the necessity of such building to the reasonable enjoyment and use of the . . . [property]. In other words, the measure of damages is the value of the building destroyed. The value of a building must be determined however, by the reasonableness of its use, as well as the evidence showing the original and reproduction cost less depreciation and other material evidence which tends to inform the jury on the subject of value." *Id.* at 9.

However, a series of later cases involving buildings destroyed by fire have

7. The parties cited many cases from other jurisdictions involving the measure of damages for a bridge (mostly highway bridges and often governed by statutory provisions for recovery) both in admiralty and at common law. Predictably, the cases are in some disagreement. *E. g.*, compare J. W. Paxson Co. v. Board of Chosen Freeholders of Cumberland County, 201 F. 656 (3rd Cir. 1912) with Johnson v. Board of County Commissioners, 138 Col. 392, 336 P.2d 300 (1959). However, neither party suggested any reason why an Illinois court faced with the issue would adopt one line of cases rather than the other nor why it would not look to Illinois Appellate Court precedents involving

damage to structures on real property for guidance. When in a diversity action there are precedents of the state in which the federal district court sits bearing upon the issue, they must be assumed to be controlling to the exclusion of other authorities ". . . unless there is persuasive evidence that the highest State court would rule otherwise." Preston v. Aetna Life Insurance Co., 174 F.2d 10, 12 (1949), cert. denied 338 U.S. 829, 70 S.Ct. 80, 94 L.Ed. 504 (1949). This court finds no evidence whatsoever that any authority other than well established Illinois property law would be considered by the Illinois Supreme Court, were it to confront this issue.

held that the proper measure of damage is ". . . the difference in value of the real estate immediately before and immediately after the fire." Dixon v. Montgomery Ward & Co., Inc., 351 Ill. App. 75, 91–92, 114 N.E.2d 44, 52 (2nd Dist. 1953); Johnson v. Pagel Clikeman Co., Inc., 343 Ill.App. 346, 99 N.E. 2d 148 (2nd Dist. 1951); Clark v. Public Service Co. of Northern Illinois, 278 Ill. App. 426 (2nd Dist. 1934). On the other hand, the cases involving the use of explosives have held that

". . . where there is liability the proper measure of damages is the cost of repairing the building and restoring it to its proper condition as it was before it was damaged by the explosion: Fitzsimons etc. Co. v. Braun et al. (1902), 199 Ill. 390, 65 N.E. 249; Baker et al. v. S. A. Healy Co. et al. (1939), 302 Ill.App. 634, 24 N.E.2d 228; Opal et al. v. Material Service Corp. (1956), 9 Ill.App.2d 433, 133 N.E.2d 733." Peet v. Dolese & Shepard Co., 41 Ill.App.2d 358, 368, 190 N.E.2d 613, 618 (2nd Dist. 1963).

While somewhat conclusory, the best reconciliation of these contradictory holdings and summary of the measure of damages for injuries to real property appears to be Kremeyer v. Shumate, 20 Ill.App.2d 542, 156 N.E.2d 271 (2nd Dist. 1959):

"Ordinarily, the difference between the fair value of the property immediately before and after the injury will be taken as the measure of damages, particularly where the injury to real estate is permanent. Where the thing which is destroyed or injured, though affixed to the realty, has a distinct value without reference to the real estate upon which it stands, the measure of recovery is for the value or depreciation of value of the thing destroyed or injured, and not for the difference of the value of the land before and after the destruction. Under some circumstances, the proper measure of damages may be the cost of restoration of the property to its condition before the injury occurred, as where the in-

jury is susceptible to be repaired at moderate expense and the cost of restoration may be shown with reasonable certainty. . . . [Citations]

"There has been no holding of any court in this jurisdiction that has been cited to us that the measure of damages for injury to improvements on real estate is the lesser sum of the difference in value immediately before and immediately after the injury, or the cost of repair. This is the rule for personal property. . . . [Citation]" Id. at 546, 156 N.E.2d 273–274.

■ In view of these Illinois decisions, IHB's contention that it is entitled to the replacement cost of the new span is simply not tenable. Instead, as stated in Kremeyer, the bridge "has a distinct value without reference to the real estate upon which it stands, [and] the measure of recovery is for the value or depreciation of value" of the span. Id. In order to determine the value of the bridge, Soo suggests that

". . . competent evidence with respect to original cost, depreciation, obsolescence, prior unrepaired damage, reasonable and necessary costs in constructing the original span, factors relating to the bridge which reasonably required repair prior to the occurrence, betterment achieved by the new span and prospective maintenance and repair cost achieved by the new span"

should be admitted. Unless IHB can suggest why any of these elements are not relevant to the determination of the bridge, competent evidence concerning them will be admitted at trial.

■ It is therefore ordered that evidence be admitted at trial showing the consequential damages of IHB as incidental to damage to joint property; that evidence relating to the cost of possible future replacement of the existing span be excluded at trial; and that evidence tending to show the actual value of the bridge at the time of its collapse be admitted at trial.